UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

ROXANNE M. NORTON                         CIVIL ACTION

VERSUS                                    NUMBER: 10-3215

MICHAEL J. ASTRUE,                        SECTION: "J"(5)
COMMISSIONER OF SOCIAL SECURITY
ADMINISTRATION


## REPORT AND RECOMMENDATION


Pursuant to 28 U.S.C. §636(b) and Local Rule 73.2(B), this matter comes before the Court on the parties' cross-motions for summary judgment following a decision of the Commissioner of the Social Security Administration denying plaintiff's application for Supplemental Security Income ("SSI") benefits based on disability. (Rec. docs. 12, 13).

Roxanne M. Norton, plaintiff herein, filed the subject application for SSI benefits on May 5, 2009, alleging disability as of February 12, 2009. (Tr. pp. 118-120). In a Disability Report that appears in the record, the conditions resulting in plaintiff's

inability to work were identified as heart/lung problems, broken ribs, an aneurysm, back problems, and a loss of hearing in the right ear. (Tr. pp. 136-142). Plaintiff's application for SSI benefits was denied at the initial level of the Commissioner's administrative review process on October 20, 2009. (Tr. pp. 78-81). Pursuant to plaintiff's request, a hearing de novo before an Administrative Law Judge ("ALJ") went forward on February 23, 2010 at which plaintiff, who was represented by counsel, and a Vocational Expert ("VE") appeared and testified. (Tr. pp. 1-35). On March 19, 2010, the ALJ issued a written decision in which she concluded that plaintiff was not disabled within the meaning of the Social Security Act. (Tr. pp. 53-73). The Appeals Council ("AC") subsequently denied plaintiff's request for review of the ALJ's decision, thus making the ALJ's decision the final decision of the Commissioner. (Tr. pp. 40-44). It is from that unfavorable decision that the plaintiff seeks judicial review pursuant to 42 U.S.C. §§405(g) and 1383(c)(3).

In her cross-motion for summary judgment, plaintiff frames the issues for judicial review as follows:

I.  [e]valuation of the medical opinion evidence did not comport with relevant legal standards.

II. [t]he ALJ failed to incorporate limitations into her RFC finding.

(Rec. doc. 12-1, p. 19).

2

Relevant to the issues to be decided by the Court are the following findings that were made by the ALJ:

1. [t]he claimant has not engaged in substantial gainful activity since May 5, 2009, the application date (20 CFR 416.971 et seq.).

2. [t]he claimant has the following severe impairments: depressive disorder, anxiety disorder and history of motor vehicle accident (20 CFR 416.920(c)).

3. [t]he claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. [a]fter careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except that she must occasionally (up to 1/3 of the time) shift positions between sitting and standing. She is limited to jobs that require simple 1, 2, 3 steps.

5. [t]he claimant is unable to perform any past relevant work (20 CFR 416.965).

6. [t]he claimant was born on January 19, 1969 and was 40 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. [t]he claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8. [t]ransferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9.  [c]onsidering the claimant's age, education, work
    experience, and residual functional capacity, there are
    jobs that exist in significant numbers in the national
    economy that the claimant can perform (20 CFR 416.969 and
    416.969(a)).

10. [t]he claimant has not been under a disability, as
    defined in the Social Security Act, since May 5, 2009,
    the date the application was filed (20 CFR 416.920(g)).

(Tr. pp. 58, 61, 62, 67, 68).

Judicial review of the Commissioner's decision to deny SSI benefits is limited to two inquiries: (1) whether substantial evidence of record supports the Commissioner's decision, and (2) whether the decision comports with relevant legal standards. Anthony v. Sullivan, 954 F.2d 289, 292 (5th Cir. 1992); Villa v. Sullivan, 895 F.2d 1019, 1021 (5th Cir. 1990); Fraga v. Bowen, 810 F.2d 1296, 1302 (5th Cir. 1987). If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed. 42 U.S.C. §405(g); Richardson v. Perales, 402 U.S. 389, 91 S.Ct. 1420 (1971). A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings exist to support the Commissioner's decision. Johnson v. Bowen, 864 F.2d 340, 343-44 (5th Cir. 1988). Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Jones v. Heckler, 702 F.2d 616, 620 (5th Cir.

1983).  The Court may not reweigh the evidence or try the issues <u>de</u> <u>novo</u>, nor may it substitute its judgment for that of the Commissioner.  <u>Cook v. Heckler</u>, 750 F.2d 391, 392 (5th Cir. 1985).  Conflicts in the evidence are for the Commissioner to resolve, not the courts.  <u>Patton v. Schweiker</u>, 697 F.2d 590, 592 (5th Cir. 1983).

A claimant seeking SSI benefits bears the burden of proving that she is disabled within the meaning of the Social Security Act.  <u>Harrell v. Bowen</u>, 862 F.2d 471, 475 (5th Cir. 1988).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which...has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. §1382c(a)(3)(A).  Once the claimant carries her initial burden, the Commissioner then bears the burden of establishing that the claimant is capable of performing substantial gainful activity and is, therefore, not disabled.  <u>Harrell</u>, 862 F.2d at 475.  In making this determination, the Commissioner utilizes the five-step sequential analysis set forth in 20 C.F.R. §416.920, as follows:

1.  an individual who is working and engaging in substantial gainful activity will not be found disabled regardless of the medical findings.

2.  an individual who does not have a "severe impairment" will not be found to be disabled.

3.  an individual who meets or equals a listed impairment in Appendix 1 of the Regulations will be

5

considered disabled without consideration of vocational factors.

4.   if an individual is capable of performing the work that she has done in the past, a finding of "not disabled" must be made.

5.   if an individual's impairment precludes her from performing her past work, other factors, including age, education, past work experience, and residual functional capacity, must be considered to determine if other work can be performed.

On the first four steps of the analysis, the claimant bears the initial burden of proving that she is disabled and must ultimately demonstrate that she is unable to perform the work that she has done in the past. _Bowen v. Yuckert_, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5 (1987).  If the analysis reaches the fifth step, the ALJ may establish that other work is available that the claimant can perform by relying on expert vocational testimony or other similar evidence to establish that such jobs exist. _Fraga_, 810 F.2d at 1304 (citing _Lawler v. Heckler_, 761 F.2d 195, 198 (5th Cir. 1985)).   Once the Commissioner demonstrates that the individual can perform other work, the burden then shifts back to the claimant to rebut that finding. _Mays v. Bowen_, 837 F.2d 1362, 1364 (5th Cir. 1988); _Fraga_, 810 F.2d at 1302.

After the documentary exhibits were formally admitted into evidence at the outset of the administrative hearing that was held on February 23, 2010, plaintiff's attorney gave an opening

statement in which she pointed out the facts justifying an award of
Social Security benefits to her client.  On February 12, 2009,
plaintiff had been run over by a truck, resulting in multiple rib
fractures, a large left pneumothorax, significant injuries to her
head, a profound hearing loss, and chronic low back pain. Plaintiff
also suffered from a disc bulge and osteophytes with foraminal
encroachment at L3-4 and L4-5 along with poor concentration and
memory, anhedonia, guilt, an increased appetite, limited
intellectual functioning, and a markedly limited ability to get
along and to relate to others, including co-workers and
supervisors.  Plaintiff's counsel argued that those limitations,
along with significant pain, rendered plaintiff unable to work on
a sustained basis for forty-hours per week. (Tr. pp. 6-7).

Plaintiff then took the stand and was questioned by her
attorney.  She testified that on the aforementioned date her
boyfriend at the time ran over her with a truck after she had
spurned his marriage proposal.  She testified that she had no
independent recollection of the incident but awoke in the hospital
two-and-a-half weeks later with significant injuries to her ribs,
heart, and lung, a brain aneurysm, and a loss of hearing which was
not remediable by surgery. Plaintiff also suffered from syncopal
episodes which initially occurred without warning but had become
somewhat more predictable.  Those episodes occurred anywhere from

one to four times per week for the previous six months.  Plaintiff was increasingly fearful of being alone and was distrustful of everyone except family members, having had her father install bars on the windows and new locks on the doors of their house.

In addition to her father, plaintiff lived with her daughter, a granddaughter from another daughter who had recently passed away, and another child.  Since the truck-related incident, plaintiff was more nervous, fearful, and suffered from anxiety attacks along with diminished lifting capacity and pain in the spine.  Plaintiff also experienced daily crying spells and was only happy when she stayed indoors.  However, she did accompany her father to the store to select items which were generally carried by him.  Plaintiff estimated that she could only lift items weighing from five to eight pounds.

Continuing, plaintiff testified to having previously worked as a fisherman, a nurse's aide, a cashier, and a deli clerk.  She was no longer able to do home repairs as she once had.  In addition to her other ailments, plaintiff also suffered from diabetes.  Walking had been recommended as part of the treatment regimen for that condition but after doing so for thirty minutes, plaintiff would begin to cry, would experience swelling to her feet and fingers, and would also develop painful fissures on the heels of her feet which sometimes bled.  Plaintiff wore an arm brace to the hearing

to control pain resulting from carpal tunnel syndrome ("CTS"), a
condition for which surgery had been contemplated but not prior to
an EMG being conducted.  She monitored her blood sugar four times
per day and admitted that Metformin and diet helped control her
diabetes.  Headaches occurred daily and back pain was constant due
to osteoporosis in the spine which was treated with Caltrate and
another drug.

Plaintiff then testified to other past incidents of violence
and domestic abuse and the injuries that resulted from those
incidents. Sleep was limited to two hours per night due to the
combination of fear and her hearing deficit.  She left home only
when accompanied by her father and had difficultly remembering
friends and acquaintances from the past.  When asked why she was
unable to work, plaintiff cited an inability to lift, pain in the
spine, syncopal episodes, a deficit in the fund of general
knowledge, and general fearfulness. (Tr. pp. 7-16).

Plaintiff was then questioned by the ALJ and admitted that she
had not reported her syncopal episodes to any doctor.  She had thus
far declined to undergo an EMG to her right hand as a predicate to
any CTS-related surgery.  The hand brace that plaintiff wore to the
hearing had been prescribed by Dr. Gessner who had reportedly
declared that she was unable to work due to that condition.  Her
prior work as a fisherman/deckhand had been performed until three

years earlier and the cashier job had been performed while she was pregnant with one of her children. Plaintiff testified that the swelling to her hands and feet had begun three months earlier and that "... everything just started cracking up ...", causing her father to take her to the hospital where she was ultimately diagnosed with diabetes, anemia, and decreased liver functioning. Her diabetes medication and diet had not completely resolved her swelling which occurred upwards of five times per week but lasted only two hours. Plaintiff was uncertain of the cause for the nerve damage to her arm. She took Fioricet and Neurontin for the respective treatment of her headaches and back pain which did help.

In terms of daily activities, plaintiff did laundry, cooked, washed dishes, and occasionally made her bed but did not sweep or mop. She no longer drove an automobile secondary to fear and her hearing deficit. Plaintiff did smoke one-half pack of cigarettes per day. For plaintiff, a typical day included cooking, washing dishes, spending time with her father outdoors, and gardening. Plaintiff disavowed watching TV but she did go to church every Sunday. She experienced pain after sitting for one hour, after standing for forty-five minutes, and after walking for thirty minutes. Plaintiff could use her fingers but they sometimes locked up. She had been prescribed Valium for anxiety but did not take it because it caused memory problems. She did, however, take Zoloft

twice per day.  The cerebral aneurysm plaintiff had been diagnosed with following the 2009 truck-related incident produced no symptoms other than headaches, syncopal episodes, fear of others, and a hearing deficit. (Tr. pp. 16-28).

Cindy Harris, a VE, was the next witness to take the stand. She first classified the exertional and skill demands of plaintiff's past job as a fisherman/deckhand as heavy and semi-skilled and those of the nurse's assistant job as medium and semi-skilled.  Plaintiff's other jobs were too remote in time to qualify as past relevant work.  The ALJ then posed a hypothetical question to Harris which assumed an individual of plaintiff's age, education, and work experience who could perform light, unskilled work that involved one to two-step tasks that were simple, routine, and repetitive for two-hour blocks of time with only occasional decision making, workplace changes, and interaction with the public and co-workers.  In answer thereto, the VE testified that the individual described in the hypothetical question could not perform plaintiff's past work.  However, the individual could function as a cashier, records clerk, or general office clerk with significant numbers of such jobs existing in the national and local economies. The ALJ then posed a second hypothetical question to Harris which assumed the same limitations that were in the first one but reduced the exertional level to sedentary with a sit/stand option and with

only occasional stair-climbing, stooping, crouching, kneeling, and crawling. In answer to that second hypothet, the VE testified that the described individual could not perform plaintiff's past work but could function as a general office clerk or a production worker.

Yet a third hypothetical question was posed to the VE which included the same basic profile as plaintiff but the individual was unable to work an eight-hour day on a regular, consistent basis due to the combination of pain and mental impairments. Faced with that hypothetical question, the VE testified that the described individual would be unable to work. Finally, the ALJ framed a fourth hypothetical question that assumed the same profile as plaintiff but the individual could not sustain sufficient concentration, persistence, and pace to do even simple routine tasks on a regular, continuing basis as a result of severe pain. Once again, the VE testified that such an individual would be unable to work. Upon being tendered to plaintiff's attorney for further questioning, the VE testified that a person would be unable to work if he or she was markedly limited in the ability to relate to supervisors and co-workers. The jobs that the VE had identified could also not be performed if an individual suffered from right radial nerve palsy and CTS in the dominant hand such that the person could not even lift five pounds, experienced occasional

lock-ups, and could not engage in repetitive motions. (Tr. pp. 28-34).

Plaintiff's counsel then gave a closing statement in which she emphasized that Dr. Gessner had previously treated plaintiff for right radial nerve palsy and had opined in August of 2008 and again in January of 2009 that plaintiff was disabled due to the combination of that condition and lumbar disc disease. The accident that plaintiff was subsequently involved in which resulted in a head injury, increased lower back pain, fractured ribs, and anxiety had rendered plaintiff unable to work. (Tr. pp. 34-35).

The documentary evidence that was generated during the relevant time period[1]/ begins with a brief treatment note from Dr. Ralph Gessner, an orthopedic surgeon, dated April 25, 2008 who had

---

[1]/ Social Security Regulations require an ALJ to develop the medical history of an individual seeking SSI benefits for the twelve-month period prior to the month in which the application for benefits was filed unless there is reason to believe that development of an earlier time period is necessary or unless the individual claims that his or her disability began less than twelve months before the application for benefits was filed. 20 C.F.R. §416.912(d). In the latter situation, the individual's medical history is to be developed beginning with the month that the disability allegedly began unless there is reason to believe that the disability began earlier. 20 C.F.R. §416.912(d)(2). Here, plaintiff filed her application for SSI benefits on May 15, 2009 and alleged disability as of February 12, 2009. Reading the foregoing Regulations in a light most favorable to plaintiff, the relevant time period thus begins in April of 2008 which was one year prior to the month in which the application for SSI benefits was filed.

apparently been treating plaintiff for a back condition. Plaintiff's back was unchanged on that date and it was noted that she had discarded the Naprosyn that had been prescribed to her due to reportedly having an ulcer. Vistaril, Fioricet, and Keflex were prescribed. (Tr. p. 228). Plaintiff returned to Dr. Gessner on May 20, 2008 complaining of an outbreak of poison ivy as well as her lower back condition. She was given an injection of Celestone and refills on her Vistaril and Fioricet. (Id.). Plaintiff was next seen by Dr. Gessner on June 10, 2008, having lacerated her right hand on a window with some resulting radial nerve weakness. Vistaril, Fioricet, and Keflex were prescribed. (Tr. pp. 227, 228). Additional Fioricet was prescribed on July 1, 2008. (Tr. p. 227).

Plaintiff saw Dr. Gessner again on July 8, 2008 who noted that she suffered from radial nerve palsy in the right wrist. EMG/nerve conduction studies were contemplated but their funding remained uncertain as plaintiff was on Medicaid. Plaintiff was given a wrist brace and refills on her Vistaril and Fioricet. Dr. Gessner parenthetically noted that plaintiff was then planning to get married on October 31, 2008. (Tr. p. 227). Plaintiff presented herself to the St. Bernard Health Center ("SBHC") on July 23, 2008 requesting a refill on her Zoloft but the rest of the treatment note from that date is largely unreadable. (Tr. p. 347). She returned to Dr. Gessner on August 8, 2008 for monitoring of her low

14

back pain and right wrist injury which had resulted in radial nerve discomfort and some weakness. At that time, Dr. Gessner declared that plaintiff was "... totally disabled from any type of gainful employment." Vistaril and Fioricet refills were given. (Tr. p. 227). When plaintiff was next seen at SBHC on August 25, 2008, she reported diminished back pain where some minimal tenderness was noted. (Tr. p. 346).

By September 5, 2008 plaintiff had experienced some slight improvement from the pressure on her right radial nerve but had jammed her hand on something in her house with a resulting exacerbation of pain and paralysis. Plaintiff was also still having trouble with her lower back. Further refills on Vistaril and Fioricet were authorized. (Tr. p. 227). Plaintiff returned to Dr. Gessner on October 10, 2008 who observed that she still had some weakness in the right wrist but was beginning to recover some of her strength. The doctor again remarked upon plaintiff's then-impending nuptials and issued refills on her Vistaril and Fioricet. (Tr. p. 226).

Following her apprehension on some outstanding warrants on October 12, 2008, plaintiff advised the arresting officers that she had been assaulted by twenty men the previous evening. The arresting officers then transported plaintiff to the Ochsner Westbank Medical Center where she was treated for multiple lower

extremity abrasions and contusions, a left shoulder strain, and a
left hand contusion. Percocet and Bactrim were prescribed. (Tr.
pp. 395-402). Refills on various prescriptions were authorized by
Dr. Gessner on November 7, December 12, and December 19, 2008. (Tr.
p. 226). Plaintiff was next seen at SBHC on January 6, 2009 to
obtain a refill on her Zoloft and for complaints of back pain.
Spasm was noted on physical examination and an MRI was ordered.
(Tr. p. 345). That procedure went forward on January 13, 2009 with
testing indicators being identified as pins-and-needles and
stabbing low back pain. Findings included discogenic endplate
changes with diminished disc signal and a posterior shallow disc
bulge and marginal osteophytosis resulting in mild midline
foraminal and medial foraminal encroachment. Disc degradation was
noted at L3-4 but without neurocompression, midline or lateral
recess, or foraminal stenosis. The impression was pathology at L3-
4, more so at L4-5, but no demonstrable neurocompression. (Tr. pp.
232, 344). Additional refills for Fioricet, Valium, Amoxil, and
Ambien were authorized by Dr. Gessner on January 13, 2009. (Tr. p.
226).

On January 14, 2009, Dr. Gessner authored a prescription pad
note in which he again indicated that plaintiff was "... disabled
due to Lumbar Disc Disease and right wrist" and was "... unable to
work at this time." (Tr. pp. 231, 286). Plaintiff would

subsequently be seen by Dr. Gessner on January 23, 2009 who interpreted the recent MRI results as demonstrating a subligamentous disc herniation at L5-S1 with resulting pain and discomfort in the lower back. As plaintiff's other medications were not helping her condition she was started on Neurontin. (Tr. p. 225). Plaintiff returned to SBHC on January 27, 2009 for continued complaints of low back pain and to obtain the recent MRI results. Overall, she was doing about the same. (Tr. p. 341-343). Dr. Gessner saw plaintiff again on February 10, 2009 who noted that she had a bad cold; antibiotics were prescribed in addition to plaintiff's other medications. (Tr. p. 225). On the personal front, Dr. Gessner also noted that plaintiff had moved in with her brother to care for him in the wake of his undergoing gastric surgery and that she was going to be busy in the upcoming weeks in preparation for her wedding. (Id.).

On February 12, 2009, plaintiff was involved in the vehicle -related incident that she would subsequently testify to at the administrative hearing. The admitting diagnoses were a motor vehicle accident, subarachnoid hemorrhage, rib fractures with a flail chest, left pneumothorax, and left ileum fracture. A chest tube was inserted to drain the air from the pneumothorax. During her five-day inpatient stay, plaintiff underwent numerous tests, including repeat x-rays of the chest and CT scans of the head,

cervical spine, chest, pelvis, and abdomen. Among the significant findings revealed through those tests were left temporal lobe peripheral contusions, a large left pneumothorax, multiple rib fractures, a right parietal bone fracture, and disc disease at L4-5. By February 17, 2009, the chest tube had been removed and there was no further evidence of pneumothorax. Plaintiff was thereupon discharged home in stable condition with the discharge diagnoses being the same as the admitting diagnoses except for the resolution of the left pneumothorax. Plaintiff was to engage in activity as tolerated and was prescribed Percocet for pain relief. (Tr. pp. 237-257).

Following her release, plaintiff returned to SBHC on February 26, 2009 for follow-up care. Chest x-rays taken at the time revealed several left-sided rib fractures, a mild left pleural effusion, and some mild scarring or atelectasis in the left lower lobe but no pneumothorax was detected. Much of the doctor's treatment note from that date is illegible but it does appear that plaintiff left the evaluation before it could be completed. (Tr. pp. 338-339). Plaintiff was next seen by Dr. Gessner on March 6, 2009 who learned for the first time of her truck-related incident of February 12, 2009 with the doctor remarking that it was "unfortunate" as plaintiff was on medication from the incident on the day of her wedding. Dr. Gessner prescribed Valium, Ambien,

Keflex, Neurontin, and Fioricet and was to obtain the report from plaintiff's hospital admission to include within her chart. (Tr. p. 225). On March 10, 2009, plaintiff was seen by Dr. Paul Verrette of SBHC for complaints of a right ear blockage and for follow-up of her rib fractures. Chest x-rays taken on that date demonstrated multiple complete and displaced left-sided rib fractures and atelectasis or contusion within the left lower lobe but no evidence of a pneumothorax. Lortab was prescribed. (Tr. pp. 336-337). Dr. Gessner prescribed Valium, Ambien, Neurontin, Fioricet, and Zantac on March 13, 2009. (Tr. pp. 222, 224).

On March 15, 2009, plaintiff was taken to the Tulane Medical Center via ambulance after being found in an altered mental state and having possibly suffered an overdose. Plaintiff was found by EMS personnel sitting upright in a chair awake and alert but confused. Witnesses reported that plaintiff had been drinking heavily for three days and had been stumbling and falling for three hours. She admitted to drinking that day and taking Lortab. Plaintiff was agitated and reluctant to go to the hospital but was ultimately transported there in a spinal-immobilized position secondary to a possible fall. Narcan was administered while en route but it produced no significant change to her condition. Once at the hospital, plaintiff remained somewhat agitated, complaining and yelling in the emergency room, generally carrying on, and

crying. She was thus placed in four-point restraints which she somehow managed to free one of her wrists from but was quickly re-secured. Chemical restraint was therefore utilized by way of Zydis Zyprexa which induced sleep. Lab testing revealed the presence of cocaine, benzodiazepine, and barbiturates. Due to the level of her sedation plaintiff was kept for observation overnight and was released the following day with a diagnosis of polysubstance abuse including cocaine abuse. (Tr. pp. 351-369).

Plaintiff returned to Dr. Gessner on March 31, 2009 who recalled that her husband had run over her in his car and that she was to have her ear operated on in two days. Plaintiff also suffered from a painful contusion to her left chest wall and a palpable mass secondary to the hematoma but x-rays were negative for fractures or dislocation. Plaintiff was prescribed Neurontin, Ambien, Valium, Doxycycline, Zantac, and Fioricet. (Tr. pp. 222, 224). Plaintiff presented herself to SBHC on April 2, 2009 for complaints of left rib pain, having run out of pain medication one week earlier. X-rays revealed left-sided rib fractures in five locations which were believed to be chronic and the presence of COPD. Tramadol was prescribed. (Tr. pp. 334-335). Later that same day, additional chest x-rays were taken at the Medical Center of Louisiana at New Orleans ("MCLNO"). No evidence of acute cardiopulmonary disease was demonstrated by those studies. (Tr. p.

258).  Lidoderm patches were prescribed by Dr. Abdul. (Tr. p. 286).

A further refill of Fioricet was authorized by Dr. Gessner on April

21, 2009. (Tr. pp. 222, 224). On May 1, 2009, prescriptions were

written for Phenergan, Keflex, Neurontin, Ambien, Valium, Fioricet,

and Zantac. (Tr. pp. 221, 223).

A CT scan, without contrast, of plaintiff's head was performed

at MCLNO on May 3, 2009.  The radiologist's impression was a low

density extra-axial mass along the lateral margin of the inferior

portion of the left temporal lobe which may possibly reflect an

arachnoid cyst or an epidermoid.  An MRI with contrast was

recommended for further evaluation. (Tr. p. 259). Plaintiff was

interviewed by an Administration employee on May 6, 2009 who

observed that her arms and hands appeared swollen and that she had

stitches on the back of her right hand which had resulted from an

altercation with her ex-husband.  Plaintiff was very emotional and

cried throughout the interview. (Tr. pp. 191-194).

On May 13, 2009, plaintiff completed the Administration's form

denominated "Function Report-Adult" that was designed to elicit

information about her activities and capabilities.  There,

plaintiff reported that her sleep was affected by difficulty in

breathing, numbness in the hands, and musculoskeletal pain to the

side and back.  Plaintiff could tend to her own personal needs at

a slowed pace and could prepare meals a couple of times per week

which consisted of sandwiches. She was capable of doing general cleaning, cooking, and laundry but sometimes needed help or encouragement. She was able to get out of her house alone but gave conflicting answers as to whether she was able to drive. Plaintiff could shop for food and clothes and could count change but could not pay bills, handle a savings account, or use a checkbook/money orders secondary to having no income. Hobbies and interests included watching TV, reading, and watering flowers. She also talked with others on the phone or in person at least every other day and she attended church alone twice per week.

Plaintiff further indicated that she had no problems getting along with family, friends, neighbors, or others but her desire to get out of the house was limited by fatigue. Her ability to lift and to reach were limited by pain, she was unable to hear out of her right ear, her memory was poor, and her hands were often asleep or numb. Plaintiff estimated that she could walk for only three minutes before needing to stop and rest but that varied depending on how poorly she felt on any given day. She indicated that she could pay attention longer than usual but then stated that she was unable to finish what she had started. Plaintiff could follow spoken instructions well and was confident that she could follow written instructions. She got along with authority figures adequately and handled stress as best as she could but was fearful

of people, trucks, and being alone. Occasionally, she relied on a family member for assistance. (Tr. pp. 152-160).

Plaintiff was seen again by Dr. Gessner for complaints of low back pain on June 2, 2009, having had to walk to the appointment because her cousin had stolen her money. Plaintiff was given some samples of Arthrotec in addition to prescriptions for Zantac, Fioricet, Valium, Ambien, Neurontin, and Phenergan. (Tr. p. 221). On June 13, 2009, plaintiff underwent CT scans of the face and head, both of which were done without contrast. The former procedure revealed findings of possible ethmoid sinusitis and degenerative changes of the temporomandibular joints bilaterally, the right greater than the left. (Tr. p. 260). The latter testing demonstrated some encephalomalacia along the lateral margin of the left temporal lobe at the site of the hemorrhage that was seen on the CT scan from February 12, 2009. However, no acute intracranial hemorrhage, mass, or evidence of an acute infarct was identified. (Tr. p. 261). Plaintiff was seen again by Dr. Verrette of SBHC on June 18, 2009 for a check of her left eye and complaints of left leg pain. The diagnosis was chronic pain; medication was prescribed. (Tr. p. 333). On June 30, 2009, Dr. Gessner authorized additional prescriptions for Zantac, Fioricet, Valium, Ambien, Phenergan, and Neurontin. (Tr. p. 221).

On the same date as the aforementioned prescription

authorizations plaintiff was consultatively evaluated by Dr. Sheldon Hersh who summarized her complaints as falling into five distinct areas. First were heart and lung problems resulting from being hit by the truck driven by her ex-boyfriend.[2]/ In providing the history of that incident, plaintiff advised Dr. Hersh that she had been hospitalized a total of three times in connection with the injuries she had suffered, the most recent being an admission for three days just two weeks earlier. However, she had no significant thoracic pain at the time and no shortness of breath, cough, or wheezing. Indeed, plaintiff stated that she no longer had any heart, lung, or rib problems and that "everything ha[d] healed up nicely." The second area of concern articulated by plaintiff was the cerebral aneurysm she was diagnosed with immediately following the incident. Plaintiff advised the doctor that said condition required no treatment or surgery but was just to be observed. Plaintiff had no symptoms related to that head injury, no history of stroke, and no history of focal neurologic findings.

The third area of concern voiced by plaintiff was decreased hearing in the right ear which was described as stable as plaintiff was able to use a phone and watch television. The fourth reported

---

[2]/ It is unclear whether the erroneous information was attributable to plaintiff or Dr. Hersh but his report incorrectly recites the truck incident as having occurred in February of 2008 rather than 2009.

problem was back pain of two years' duration which was not precipitated by trauma and did not radiate. Plaintiff had no difficulty sitting, was able to stand up to two hours, and could walk three blocks but could carry very little. Heat and medication provided slight relief. And fifth, plaintiff complained of ongoing problems with nerves, being scared all of the time and crying as she conveyed that information to the doctor. Plaintiff had moved in with her father and would only go out when accompanied by him. She reported poor sleep, an increased appetite, felt sad and depressed, had poor memory and concentration, had anhedonia and bad, guilty feelings, decreased energy, and occasionally thought about dying but was not suicidal. Plaintiff had a satisfactory fund of general knowledge but cried throughout the doctor's line of questioning and for the rest of the history and much of the physical examination.

In the "Past History" portion of his report, Dr. Hersh noted that plaintiff smoked one pack of cigarettes per day for twenty years but did not drink alcohol. Activities of daily living included cooking, cleaning, and occasionally shopping but plaintiff left her house only rarely. Upon physical examination, plaintiff's chest was clear with good breath sounds and she was able to lie down at 20 degrees without discomfort. There were no signs of COPD or congestive heart failure. Examination of the abdomen was

unremarkable.  Plaintiff had normal pinch and grip strength in the upper extremities with a full range of motion.  She sat without discomfort during the examination, straight leg raising was negative, there was no back tenderness or spasm, and there was no pain with ambulation.  Plaintiff had no edema in the lower extremities and had a full range of motion with no joint discomfort or atrophy.  Her gait was stable, she was able to walk on her heels and toes, and she was able to rise from a seated position without using her hands.  Although plaintiff cried profusely, she answered questions appropriately, was not psychotic, and her mental status was otherwise normal.

In summarizing plaintiff's problems, Dr. Hersh remarked that plaintiff had no complaints, nor were there any adverse findings, with respect to her heart or lungs.  The cerebral aneurysm had been an incidental MRI finding following plaintiff's truck-related incident but there were no neurologic complaints or a need for neurologic procedures.  Although plaintiff had decreased hearing in the right ear, she had no difficulty communicating at a normal conversational level and did not wear a hearing aid.  Unlike her physical difficulties, however, plaintiff's anxiety and depression were thought to be a significant problem.  Plaintiff also had significantly elevated blood pressure which needed to be better controlled.  In the assessment portion of his report, Dr. Hersh

opined that plaintiff's grip and pinch strength were normal as was her gait. There was no congestive heart failure or angina. It was felt that plaintiff should avoid strenuous exertion until her blood pressure was better controlled. Work in a stressful environment was thought to be difficult due to plaintiff's depression and it was believed that she would benefit from a psychiatric evaluation. (Tr. pp. 279-282).

Plaintiff returned to Dr. Gessner on August 14, 2009, reporting increased depression after her daughter had passed away the previous week. She also had problems of her own, having recently gotten out of jail. A foot burn was to be treated with Keflex and plaintiff was given additional prescription refills for Ambien, Valium, Fioricet, and Zantac. (Tr. p. 220).

On September 3, 2009, plaintiff underwent a consultative psychological evaluation by Dr. Thomas Welsh. Certain medical and non-medical documentation was provided to the doctor in connection with his evaluation who believed that plaintiff's description of the evaluation procedures and the consent form evidenced adequate comprehension. In providing her family history, plaintiff advised Dr. Welsh that she had married at the age of fifteen and remained married to the same man for twenty-three years until he ran her over with his truck, causing her to divorce. Plaintiff's eighteen-year old daughter, one of her three children, had died on August 1,

2009 and since that time, plaintiff was taking care of the deceased daughter's ten-month old daughter. A family history of substance abuse or mental illness was denied. In the "medical/health" portion of the report, Dr. Welsh noted that plaintiff's ex-boyfriend had run over her with a truck in March of 2009 resulting in various injuries. Plaintiff complained of back pain, arthritis, a hearing deficit, a cerebral aneurysm, heart and lung trouble, chronic pain, and "bad nerves". The aneurysm had supposedly affected plaintiff's hearing and the circulation on her right side. Plaintiff identified her primary care physician as Dr. Bertucci and had been prescribed Hydrocodone, Oxycodone, Ketoconazole, Diclofenac, Promethazine, Rozearam, Zoloft, and Diazepam. Hospitalizations and surgeries had been for fractured ribs, her appendix, and her gallbladder.

Plaintiff further advised Dr. Welsh that she had chronically poor sleeping patterns, often not sleeping at all and barely sleeping the previous four nights. Appetite was reportedly poor but plaintiff denied any significant weight gain or loss over the previous six months. On the mental/emotional front, plaintiff recited symptoms consistent with an anxiety-related syndrome and a mood disorder with significant events being the recent death of her daughter and being shot, stabbed, burned, and run over as a result of domestic abuse. Plaintiff further reported that her ex-husband

had tried to kill her in February of 2008 by running her over with a pick-up truck and that he had since been incarcerated in connection with the incident. Since that time, plaintiff was constantly scared, had moved in with her father, and was afraid to go out in public alone. She had daily obsessions over germs as well as compulsive urges to clean her father's house. Plaintiff was currently taking Zoloft which was helping her feel less depressed and anxious but the use of Diazepam had been discontinued. Chronic back pain often disturbed her sleep and exacerbated her depression. She stated that people made her nervous and that she did not like anybody.

At the time of the evaluation, plaintiff was serving a five-year term of probation on a drug charge that she allegedly pled guilty to so her ex-husband would avoid a longer prison sentence. Current substance abuse, including alcohol, was denied but plaintiff had used marijuana in the past and had attended a treatment center as a teenager. In providing her employment history, plaintiff advised Dr. Welsh that she had always worked as a self-employed fisherman on an oyster boat but, under doctor's orders, was not working at the time due to her aneurysm. Upon mental status examination, plaintiff presented as cooperative but was a bit guarded at first. Rapport and eye contact were good and mood appeared mostly normal with some underlying sadness,

anxiousness, and irritability. Plaintiff cried a few times when recounting past instances of domestic abuse and her daughter's death. She was easily understood and appeared to hear and process what was said to her with organized and goal-directed thinking and normal thought rate and continuity. Concentration, attention span, and remote memory were normal and short-term memory appeared adequate. Insight and judgment were intact and effort and motivation were adequate.

In the area of independent/adaptive functioning, Dr. Welsh noted that plaintiff had a driver's license and was able to drive as well as to take public transportation by herself without getting lost or confused. She was able to dress and groom herself without assistance and could perform all basic household tasks and prepare meals on a gas range. Plaintiff understood money and could shop by herself and use the telephone. Despite complaints of occasional problems to the contrary, there was no evidence of poor short-term memory functioning. Intellectual functioning was estimated to be in the high borderline to low average range and her ability to understand, remember, and carry out complex oral or written instructions was only mildly limited. No evidence of concentration problems was exhibited during the mental status examination. Plaintiff's ability to maintain sufficient attention to perform simple repetitive tasks for two-hour blocks of time was not limited

nor was her ability to sustain effort and to persist at a normal pace over the course of a workweek as long as she could work alone. Historically, plaintiff always had problems getting along with others which is why she typically worked alone. Despite wanting to return to fishing a doctor had counseled her against doing so because the stress would aggravate her cerebral aneurysm. Dr. Welsh believed that plaintiff's ability to tolerate the stress/pressure of work activities and demands was not limited as long as she could work alone. However, her ability to relate to supervisors and co-workers was thought to be markedly limited due to anxiety.

In the conclusions and recommendations section of his report, Dr. Welsh remarked that plaintiff suffered from a depressed mood that was in partial to full remission with medication and anxiety in partial remission with medication. Plaintiff had been caring for her ten-month old grandchild since her daughter's death on August 1, 2009 which was helping her cope with that untimely event. The prognosis was fair from a psychological point of view. The diagnostic impressions were: 1) Axis I-depressive disorder, not otherwise specified, in partial to full remission with medication; anxiety disorder, not otherwise specified, in partial remission with medication; and, nicotine dependence, 2) Axis II - no diagnosis; and, 3) Axis III - deferred to medical records. (Tr. pp.

284-285, 287-289).

On September 8, 2009, Dr. Gessner authorized prescription refills for Valium, Ambien, Keflex, Fioricet, Zantac, and Neurontin. (Tr. p. 220). Plaintiff would subsequently be seen by Dr. Gessner on October 6, 2009 for complaints of lower back and hearing problems. She reported that she had surgery and suffered from hearing loss. The doctor did note a hearing deficit, especially in the right ear, and lower back pain for which he prescribed Amoxil, Valium, Ambien, Fioricet, Zantac, and Neurontin. (Tr. pp. 219-220).

On October 15, 2009, an Administration psychological consultant reviewed plaintiff's file and set forth her opinions in two separate standardized forms. In the first form, titled "Psychiatric Review Technique", the psychologist checked off he appropriate boxes to indicate that a residual functional capacity assessment of plaintiff was necessary, that she had a co-existing non-mental impairment requiring a referral to another medical speciality, and that her mental condition had been measured against the criteria of Listings 12.04 and 12.06 of the Listing of Impairments. Relying on the diagnosis that had been rendered by Dr. Welsh, the consultant found that plaintiff suffered from depressive and anxiety disorders, not otherwise specified, that did not precisely satisfy the diagnostic criteria of Listings 12.04 and

12.06 of the Listing of Impairments. Plaintiff was thought to have moderate limitations in maintaining social functioning and in maintaining concentration, persistence, or pace but only a mild limitation in the activities of daily living and had experienced no episodes of decompensation, each of extended duration. However, the evidence did not establish the presence of the criteria of Listings 12.04(C) or 12.06(C). (Tr. pp. 291-304).

The second form that was completed by the psychological consultant was denominated "Mental Residual Functional Capacity Assessment". In that form, the consultant checked off the appropriates boxes to indicate that plaintiff was moderately limited in one of the areas of understanding and memory but was not significantly limited in the other two. In the category of sustained concentration and persistence, plaintiff was moderately limited in three of the enumerated areas but was not significantly limited in the other five. In social interaction, plaintiff was believed to have moderate limitations in two of the areas but no significant limitations in the other three. In the "Functional Capacity Assessment" portion of the form, the psychological consultant opined that plaintiff retained the ability to understand and remember short and simple instructions, locations, and work-like procedures. The moderate limitations in her social functioning would not interfere with her ability to maintain

socially appropriate behavior in a work setting nor with her ability to ask simple questions or to or request assistance. Plaintiff seemingly retained the ability to perform activities within a schedule, maintain regular attendance, and make simple work-related decisions. Overall, it was felt that plaintiff was capable of performing simple duties that could be learned on the job in a short period of time which involved things rather than people. (Tr. pp. 305-308).

On October 16, 2009, an Administration physician reviewed plaintiff's file and set forth his findings in a "Physical Residual Functional Capacity Assessment" form, identifying the primary diagnosis as a history of a motor vehicle accident, the secondary diagnosis as a history as a cerebral aneurysm and low back pain, and the other alleged impairment being a hearing impairment on the right. There, the physician concluded that plaintiff could occasionally lift fifty pounds and could frequently lift twenty-five pounds; could sit, stand, and/or walk for six hours per eight-hour workday; had an unlimited ability to push and/or pull; could occasionally climb a ramp/stairs/ladder/rope/scaffolds but could frequently perform the other postural maneuvers; had no manipulative or visual limitations; had a limited ability to hear in the right ear; and, was to avoid concentrated exposure to extreme heat and cold but had no other environmental limitations.

The Administration's reviewing physician found plaintiff's alleged symptoms and limitations to be only partially credible, ultimately concluding that plaintiff was capable of performing medium-level work. (Tr. pp. 309-316).

Plaintiff returned to Dr. Gessner on November 6, 2009 who noted that she had back and hearing problems and had undergone surgery but still had a hearing loss, especially on the right. Plaintiff was continued on Amoxil, Zantac, Fioricet, Ambien, Valium, and Neurontin. (Tr. p. 219). She was next seen at SBHC on November 9, 2009 for complaints of fluid retention and an inability to get the ring off her ring finger. The ring was cut off and plaintiff was diagnosed with an incarcerated ring and anxiety. Bloodwork was done which produced various abnormal findings. An x-ray of the left foot was taken in response to complaints of pain but the results of that study were normal. (Tr. pp. 328-332).

On November 10, 2009, plaintiff presented herself to the Ochsner Medical Center emergency room complaining of pain all over in connection with a motor vehicle accident three days earlier, right leg swelling, and left leg pain. Upon physical examination, plaintiff appeared anxious, had ecchymosis of the right eye, had swelling to the left foot, and had redness at the site where her ring had been removed. An x-ray of the left hand was normal and one of the foot revealed mild degenerative joint disease and a spur

on the calcaneus but no acute process was seen. The impression was a contusion to the left foot and early cellulitis to the left hand. Plaintiff was told to discontinue the use of Tylenol, was prescribed Doxycycline, Tramadol, and Flexeril, and was discharged home in stable condition. (Tr. pp. 373-394).

Plaintiff was next seen at SBHC on November 17, 2009 for the purpose of reviewing some recent test results. The diagnosis included high liver function tests, tenia versicolor, and chronic pain all over. Her medications were adjusted. (Tr. pp. 322-327). On November 19, 2009, plaintiff underwent a limited abdominal sonogram at SBHC which revealed post-op cholecystectomy change, hepatomegaly with fatty change of the liver, and mild nonspecific fullness to the left renal collecting system. (Tr. p. 321). Plaintiff presented herself to SBHC on December 2, 2009 but left before an evaluation could be performed. (Tr. p. 320). She did return on December 7, 2009 to obtain the most recent lab results. Records from that date indicate that plaintiff had been taking upwards of ten Tylenol per day and suffered from osteoporosis. The diagnosis was high liver function tests, a history of a brain aneurysm, and carpal tunnel syndrome. Medications were prescribed including Zoloft, Neurontin, and Fioricet. (Tr. pp. 317-319). The hearing before the ALJ would subsequently go forward on February 23, 2010.

As noted earlier, plaintiff challenges the Commissioner's decision to deny SSI benefits on two grounds. In the first of those, plaintiff argues that the ALJ's evaluation of the medical opinion evidence did not comport with relevant legal standards. More specifically, plaintiff alleges that the reasons that were given by the ALJ in rejecting the opinion of Dr. Gessner, i.e., that the opinion pre-dated the alleged onset date and lacked other support in the record, including the doctor's own examination findings, run afoul of the Administration's requirement that a claimant's medical history be developed for the twelve-month period preceding the alleged onset date and without consideration of all of the factors set forth in 20 C.F.R. §416.927(d).[3]/ In addition, plaintiff alleges that the ALJ, in crediting some of the opinions

---

[3]/ Under Title 20 C.F.R. §404.1527(d), the counterpart to §416.927(d) in the context of Disability Insurance Benefits, an ALJ is to consider the following factors before declining to give a treating physician's opinions controlling weight:
1)   the physician's length of treatment of the claimant;
2)   the physician's frequency of examination;
3)   the nature and the extent of the treatment relationship;
4)   the support of the physician's opinion afforded by the medical evidence of record;
5)   the consistency of the opinion with the record as a whole; and,
6)   the specialization of the treating physician.

See Newton v. Apfel, 209 F.3d 448, 456 (5th Cir. 2000).

of Dr. Welsh, failed to discuss the weight that she accorded to the doctor's opinions that plaintiff's ability to tolerate day-to-day work activity and demands was not limited as long as she was able to work alone and that her ability to relate to supervisors and co-workers was markedly limited due to anxiety.

The law is clear that the ALJ has the sole responsibility for determining a claimant's disability status and is free to reject the opinion of <u>any</u> physician when the evidence supports a contrary conclusion. <u>Newton v. Apfel</u>, 209 F.3d 448, 455 (5th Cir. 2000)(quoting <u>Paul v. Shalala</u>, 29 F.3d 208, 211 (5th Cir. 1994), <u>overruled in part on other grounds by Sims v. Apfel</u>, 530 U.S. 103, 120 S.Ct. 2080 (2000)). A treating physician's opinions are not conclusive and may be assigned little or no weight when good cause is shown. <u>Newton</u>, 209 F.3d at 456 (citing <u>Brown v. Apfel</u>, 192 F.3d 492, 500 (5th Cir. 1999) and <u>Greenspan v. Shalala</u>, 38 F.3d 232, 237 (5th Cir. 1994), <u>cert</u>. <u>denied</u>, 514 U.S. 1120, 115 S.Ct. 1984 (1995)). Good cause exists when the treating physician's opinions are so brief and conclusory that they lack persuasive weight, when they are not supported by medically acceptable techniques, or when the evidence supports a different conclusion. <u>Newton</u>, 209 F.3d at 456; <u>Bradley v. Bowen</u>, 809 F.2d 1054, 1057 (5th Cir. 1987); <u>Scott v. Heckler</u>, 770 F.2d 482, 485 (5th Cir. 1985). The Regulations require the ALJ to perform a detailed analysis of a treating

physician's views under the criteria set forth in 20 C.F.R. §§404.1527(d) and 416.927(d) only in the absence of controverting medical evidence from other treating and/or examining physicians. Newton, 209 F.3d at 453.

As respects Dr. Gessner, the Court begins by reciting in full the statement in the ALJ's written decision to which plaintiff takes exception, as follows:

> Dr. Gessner's <u>opinion</u> is rejected as it predates the alleged onset date and is unsupported by the totality of the record or his findings on examination. (Exhibits 1F at 9 and 4F at 4).
>
> (Tr. p. 66)(emphasis added).

The exhibits cited by the ALJ and the "opinion" set forth in them are duplicate copies of a prescription pad note authored by Dr. Gessner on January 14, 2009 in which he states that "[t]he above named pt is disabled due to Lumbar Disc Disease and right wrist. Pt is unable to work at this time." (Tr. pp. 231, 286). Statements such as the one made by Dr. Gessner embrace the ultimate issue reserved to the Commissioner and are thus not binding. 20 C.F.R. §416.927(e)(1). In addition, the doctor's brief, conclusory statement is unaccompanied by any contemporaneously-recorded, medically acceptable findings; such "TO WHOM IT MAY CONCERN" letters are thus typically entitled to little weight. <u>Warncke v. Harris</u>, 619 F.2d 412, 417 (5th Cir. 1980). The Court also notes

that plaintiff failed to identify a wrist impairment as a disabling condition in her application for SSI benefits.  See Pierre v. Sullivan, 884 F.2d 799, 802 (5th Cir. 1989).  And contrary to plaintiff's present assertions, the ALJ did not neglect to adequately develop the record from a temporal standpoint, specifically citing 20 C.F.R. §416.912(d) and discussing plaintiff's treatment records from Dr. Gessner going back to at least June of 2008. (Tr. pp. 56, 59).

Moreover, as compared with the detailed, comprehensive report issued by Dr. Hersh, the Court cannot help but note the extremely brief, cursory nature of all of Dr. Gessner's treatment records. During the relevant time period, plaintiff would be seen by Dr. Gessner on fifteen occasions beginning with April 25, 2008 and ending with November 6, 2009.  The treatment notes that were prepared by the doctor on each of those occasions typically consist of several sentences which are largely recordations of complaints recited by plaintiff and events of her personal life. (Tr. pp. 219-228).  The treatment notes are almost totally devoid of any contemporaneously-recorded, medically acceptable findings. (Id.). The ALJ gave Dr. Gessner's opinions, particularly the "opinion" that she referenced in her written decision, the weight that they deserved.

The Court, however, harbors some doubt as to whether the

record was properly developed with respect to plaintiff's mental condition. Although plaintiff failed to specifically identify a mental impairment as a disabling condition in her application for SSI benefits, the Administration acknowledged that such did exist as it sent her to a consultative evaluation by Dr. Welsh, had a psychological consultant opine on its effects, and identified depressive anxiety disorders as severe impairments in the written decision that was issued by the ALJ. Dr. Welsh, who is presumably of a conservative nature, found that plaintiff's anxiety was not fully controlled with medication and that it markedly limited her ability to relate to supervisors and co-workers. The psychological consultant similarly concluded that plaintiff was better suited for simple duties that involved things rather than people.

Historically, plaintiff has typically worked alone and her ability to interact with others was undoubtedly affected further as a result of the motor vehicle accident that she was involved in, raising the spectre of the possible existence of post-traumatic stress disorder which has not been addressed at all. According to the hypothetical questions that the ALJ propounded to the VE, disability would not be established based upon plaintiff's physical conditions alone. However, in both instances where mental issues were interjected into the hypothet, the VE testified that plaintiff would be unable to work. Plaintiff's IQ has not been tested which

would be of some relevance in determining her ability to interact with others. Accordingly, it will be recommended that plaintiff's case be remanded to the Commissioner for further evaluation and consideration of her mental impairments.[4]/

## RECOMMENDATION

For the foregoing reasons, it is recommended that plaintiff's case be remanded to the Commissioner for further evaluation and consideration of plaintiff's mental impairments.

A party's failure to file written objections to the proposed findings, conclusions, and recommendation contained in a magistrate judge's report and recommendation within fourteen days after being served with a copy shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court, provided that the party has been served with notice that such consequences will result from a failure to object. Douglass v. United Services Auto. Assoc., 79 F.3d 1415 (5th Cir. 1996)(en banc).

New Orleans, Louisiana, this __18th__ day of _____January_____, 2012.

ALMA L. CHASEZ
UNITED STATES MAGISTRATE JUDGE

---

[4]/ In light of the Court's recommendation, a discussion of plaintiff's second challenge to the ALJ's decision is pretermitted.